Submitted May 17, 2013, affirmed February 26, petition for review allowed July 10, 2014 (355 Or 751)

ECLECTIC INVESTMENT, LLC,
*Plaintiff,*

*v.*

Richard PATTERSON, et al,
*Defendant.*

JACKSON COUNTY,
*Cross-Claim Plaintiff-Appellant,*

*v.*

Byron McALLISTER, Jr.,
dba Greater Crater Construction Company,
*Cross-Claim Defendant-Respondent.*

Jackson County Circuit Court
070197L3; A150458

323 P3d 473

Michael Jewett filed the briefs for appellant.

James A. Wallan and Hornecker, Cowling, Hassen & Heysell, L.L.P., filed the brief for respondent.

Before Duncan, Presiding Judge, and Wollheim, Judge, and Schuman, Senior Judge.

SCHUMAN, S. J.

## SCHUMAN, S. J.

Respondent McAllister performed some excavation work on property owned by Eclectic Investment, LLC (Eclectic), as part of Eclectic's plan to expand its parking lot. Appellant Jackson County (the county) inspected the work and issued a permit approving it. The excavation created a dirt bank that failed after a rain storm and damaged Eclectic's property. Eclectic brought a negligence action against, among others, McAllister for performing substandard excavation and the county for approving it. The jury found that Eclectic was 55 percent at fault. *See* ORS 31.600(1). Therefore none of the defendants—including appellant and respondent in this case—had to pay damages. However, the county sought indemnity for its litigation costs from McAllister, contending that the county's negligence, if any, in issuing a permit for the construction project after having inspected it, was "passive or secondary," while McAllister's negligent construction was "active or primary." *See Astoria v. Astoria & Columbia River R. Co.*, 67 Or 538, 136 P 645 (1913) (distinguishing between active and passive negligence for purposes of entitlement to common-law indemnification). The indemnity issue was severed from the negligence claim and tried to the court, which found that the county was not entitled to indemnity from McAllister. The county appeals, and we affirm.

The parties stipulated to the following facts. In December 2004, Eclectic wanted to enlarge its parking lot and hired McAllister, doing business as Greater Crater Construction Company, to do the job. To create more space, McAllister excavated a dirt bank at the rear of the lot and, in the process, increased the existing bank's slope. At the time, the county had not issued Eclectic an excavation permit; the county first became aware of the project after the slope had been cut, when a county inspector observed McAllister doing some of the work at the job site. Eclectic subsequently applied for an excavation permit. The county denied the application because it was not sufficiently detailed. Eclectic then submitted a second application and received a preliminary permit. However, when a county inspector went to the site the next day, he withheld final approval because

he found no site plan on the premises, noted minor erosion problems, and had concerns about gravel compaction and a small retaining wall near a structure on the premises. After another county inspection on March 23, 2005, the county gave final approval for the project. In December 2005, a significant rainstorm caused topsoil to wash off the slope onto Eclectic's parking lot and into a building, resulting in damage to Eclectic's property.

Eclectic then brought a negligence action against McAllister, the county, and two neighbors, seeking damages resulting from the failed slope. Eclectic alleged that McAllister was negligent in creating a slope that was too steep for soil conditions, performing work without first obtaining a permit, and failing to take remedial action after observing some erosion on the slope. Eclectic alleged that the county was negligent in approving the slope of the excavation and in issuing a permit when the county knew the slope was too steep; in failing to enforce the Oregon Structural Specialty Code; in failing to issue a stop work order or requiring McAllister to take remedial measures to prevent the slope's failure; and in failing to require remedial measures when erosion was observed during inspection. The county then filed a cross-claim against McAllister for indemnity. The court severed that claim for a separate trial.

On Eclectic's claim, the jury allocated fault as follows: 55 percent to Eclectic, 7 percent to the county, 4 percent to McAllister, and a total of 34 percent to two neighbors. Because Eclectic's contributory negligence exceeded 50 percent, the court entered judgment in favor of all defendants.

Thereafter, the county pursued its cross-claim against McAllister, seeking indemnification for $23,345 expended by the county in the litigation.[1] The cross-claim was tried

---

[1] Although one of the early leading cases on indemnity, *Fulton Ins. v. White Motor Corp.*, 261 Or 206, 210, 493 P2d 138 (1972), *overruled in part on other grounds by Waddill v. Anchor Hocking, Inc.*, 330 Or 376, 8 P3d 200 (2000), states that a prerequisite for indemnity is that the indemnitee and indemnitor have both been found liable to a common plaintiff, a subsequent opinion of this court clarifies that one defendant can receive indemnification from another for the cost of defending the claim, even if, as here, both defendants were successful and neither defendant was found to be liable. *PGE v. Const. Consult. Assoc.*, 57 Or App 116, 120, 643 P2d 1334 (1982).

to the court on stipulated facts. In a judgment in favor of McAllister, the court determined that the county had failed to satisfy the standards for establishing indemnity. Commenting on cases that appear to hold that one defendant is entitled to indemnity from another defendant only if the indemnitee is passively negligent and the indemnitor is actively negligent, *Astoria*, 67 Or at 547-48, the court found that the two parties had "different levels of 'activity' in relation to the harm[,]" characterizing McAllister as "minorly 'active'" and the county as "barely 'passive.'" The court noted that the jury's allocation of fault did not determine whether the parties were actively or passively negligent, but that it was "an important factor that should be taken into consideration when performing the analysis in an indemnity claim." Finally, the court found that "[t]he question appears ultimately to be one of equity" which asks "whether the defendant *should have* discharged the obligation rather than the plaintiff." (Emphasis in original.) The trial court concluded that, while "McAllister clearly was more active *** in creating the harm," the county "was not completely passive because it inspected the excavation twice[,]" and that the quality of the parties' conduct did not "warrant burdening [McAllister] with Jackson County's cost of defense." The trial court, in other words, regarded the "active" versus "passive" distinction as one factor to consider in ultimately deciding the case based on equitable concerns. We agree with that approach.

The Oregon cases dealing with indemnity among co-tortfeasors appear to employ a variety of decisional rules. As noted, the earliest case, *Astoria*, 67 Or at 548, appears to focus on the active/passive dichotomy. The county relies heavily on that case, noting that its facts are similar to the facts in the present case. In *Astoria*, the city allowed a railroad company to construct tracks across a public street, contingent on the railroad company installing several safety features such as railings and ramps. The railroad company did not follow those safety requirements, and, as a result, a pedestrian injured herself at a crossing. The pedestrian sued the city for failing to remedy a dangerous condition or enforce the requirements of the ordinance, and she obtained

a judgment for $5,000. The city, in turn, sought indemnification from the railroad company for both the adverse judgment and the attorney fees associated with the action. The court stated, "[I]t plainly appears that the active negligence charged is against the railroad company, while passive negligence only is laid at the feet of the municipality." *Id.*

In another sentence, however, the court also noted, "The efficient and primary cause of the accident was the negligence of the company, while the subsequent negligence of the city in not enforcing obedience to the terms of the ordinance was constructive rather than actual." *Id.* That sentence gave rise to a second criterion for determining entitlement to indemnification: "primary" negligence versus "secondary" negligence. Many subsequent cases use both of the analyses. *E.g.*, *General Ins. Co. v. P. S. Lord*, 258 Or 332, 337, 482 P2d 709 (1971) (one party "was an active, positive and primary participant" and therefore had to indemnify the other party); *Fulton Ins.*, 261 Or at 210 (One liable defendant seeking indemnity from another can succeed only if the indemnitee's liability was "'secondary' or his fault merely 'passive,' while that of the [other] defendant must have been 'active' or 'primary.'" (citing *Kennedy et al v. Colt*, 216 Or 647, 653-54, 339 P2d 450 (1959)). To the extent that the Supreme Court has ever formulated a distinction between "active/passive" and "primary/secondary," it appears to have regarded the latter as a reference to chronological sequence, *see Astoria*, 67 Or at 548 (secondary negligence was "subsequent"), or, more frequently, the courts have held that a "secondary" defendant deserves indemnity when its negligence occurs due to the express direction or misrepresentation of the "primary" defendant. *See Scott v. Francis*, 314 Or 329, 334, 838 P2d 596 (1992) ("A person who is induced to act as a result of another's misrepresentation, and thereby becomes liable to a third person, is not necessarily in equal fault with the person who made the misrepresentation."); *Kennedy*, 216 Or at 654-55 (where the plaintiff was liable for trespassing on a third-party's land and cutting timber "as a result of express direction" of the defendant, an indemnity claim was proper because the defendant made a misrepresentation and "was primarily responsible for the trespass by plaintiffs

and thus constructively liable for it"). Further, courts have observed that the active/passive and primary/secondary determinations are frequently unhelpful. In *General Ins. Co.*, 258 Or at 336, the Supreme Court noted,

> "The words 'passive' versus 'active' and 'secondary' versus 'primary' are not sufficiently precise to provide clear guidelines for this area. Prosser observes, however: '* * * [I]t is extremely difficult to state any general rule or principle as to when indemnity will be allowed and when it will not.' He formulated the rule: '* * * [T]he duty to indemnify will be recognized in cases where community opinion would consider that in justice the responsibility should rest upon one rather than the other.' Prosser, Torts, 281 (3d ed)."

This court has recently noted that the distinction between 'active' or 'primary' and 'passive' or 'secondary' negligence is "amorphous" and "somewhat obtuse." *Maurmann v. Del Morrow Construction, Inc.*, 182 Or App 171, 178 n 4, 48 P3d 185 (2002).

In fact, as McAllister notes, the cases are nearly uniform in invoking active/passive and primary/secondary as relevant but not dispositive considerations. In *General Ins. Co.*, 258 Or at 337, the owner of a building brought an action against Colby Steel, the manufacturer of elevator equipment, and P. S. Lord Mechanical Contractors, the company that installed the elevators. The trial court determined that Colby was the "active, positive and primary participant" in causing damages, yet, on appeal, the Supreme Court held:

> "The trial court in its written opinion pointed out that Waterway charged both Lord and Colby with negligence in failing to provide a lookout and adequate fire extinguishing equipment and in failing to properly shield the dock timbers from the material being welded. Colby's engineer testified that he had 'instructed,' 'agreed' and 'discussed' with Lord's supervisor the fire precautions to be in effect, including the lookout, fire extinguishers and shield. Under the existing principles of indemnity, Colby is not entitled to indemnity."

*Id.* In *Fulton Ins.*, 261 Or at 211, the court observed that "the traditional formulations of active and passive negligence, or primary and secondary liability, do not provide

precise guidelines for deciding close cases." Again, in *Piehl v. The Dalles General Hospital*, 280 Or 613, 620, 571 P2d 149 (1977), the court declared, "The basis for indemnity between tortfeasors involves the equitable distribution of responsibility, and there can be no all-encompassing rule." (Footnote omitted.) *Accord Scott v. Francis*, 100 Or App 392, 397, 786 P2d 1269, *modified on recons*, 104 Or App 39, 789 P2d 1111 (1990), *vac'd*, 311 Or 151, 806 P2d 129, *adopted as modified*, 107 Or App 766, 811 P2d 927 (1991), *aff'd*, 314 Or 329, 838 P2d 596 (1992). ("[W]e confess some uncertainty as to the application or breadth of the primary verses secondary responsibility * * * [because] the court appears to have stated it more generally as 'the equitable distribution of responsibility.'"); *Maurmann*, 182 Or App at 178 ("Thus, in general, common-law indemnity is available where, 'in justice,' either the relationship of the parties or the quality of their respective conduct warrants that one of them should bear the full responsibility for joint liability to an injured third party.").

It is therefore apparent that, in considering the active/passive factor, but not relying on it, the trial court did not err. Rather, it considered the totality of the circumstances, stating that "the question appears ultimately to be one of equity" which asks "whether the defendant *should have* discharged the obligation rather than the plaintiff" (emphasis in original) and concluded on that basis that the county was not entitled to indemnification even though its negligence was slightly less active than McAllister's. We review that conclusion for errors of law, and, as noted above and explained below, we agree.[2]

---

[2] The parties agree that the standard of review for the ultimate issue, that is, whether the county is entitled to indemnification, is for legal error. Some cases and commentators, however, indicate that deciding that a party's negligence was active or passive is a fact determination. *See General Ins. Co.*, 258 Or at 337 ("In the instant case the trial court found that the facts were similar in legal effect to the latter example, that is, that Colby 'was an active, positive and primary participant in the acts or omissions which Waterway contended proximately caused its fire loss.' The evidence supports such a finding."); *Piehl*, 280 Or at 619 ("Because we believe there was evidence from which the jury could have found the doctor was actively negligent in not discovering [a sponge], the trial court was in error in directing a verdict in favor of the defendant surgeon on the issue of indemnity."); Daniel Waltz, *Total Equitable Indemnity Under Comparative Negligence: Anomaly or Necessity?*, 74 Cal L Rev 1057, 1069-70 (1986) ("The doctrine could also remain poorly defined because eligibility for [common-law indemnity] was treated as a fact question to be submitted to the jury."). In none of the cases was

The trial court found,

> "In the instant case, Jackson County was not completely passive because it inspected the excavation twice. McAllister clearly was more active than Jackson County in creating the harm, but the court is not persuaded that he is active enough to warrant burdening him with Jackson County's cost of defense."

Implicitly, that finding was based on evidence that the county had negligently issued a permit and provided final approval of the excavation after two inspections. In reaching that approval, the county, through its inspector, was obligated to perform the inspection and permitting so as to avoid creating a foreseeable risk of harm to the landowner. *See Brennen v. City of Eugene*, 285 Or 401, 407, 591 P2d 719 (1979) (where a licensing agent has a responsibility to follow requirements, they must perform this duty so as to avoid creating a foreseeable risk of harm to others). The first county inspector withheld approval because an engineer needed to approve the steepness of the slope. At

the standard of review a contested issue or outcome-dispositive. Further, in the more than three decades since those cases, we have refined our jurisprudence relative to fact issues and legal issues, most recently in a juvenile dependency case, *Dept. of Human Services v. N. P.*, 257 Or App 633, 639-40, 307 P3d 444 (2013):

> "[W]e view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome. Specifically, with respect to a juvenile court's determination [that a parent's condition presents a current risk of harm] we: (1) assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record; (2) further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact and it could have reached the disposition that it reached only if it resolved that issue in one way, the court implicitly resolved the issue consistently with that disposition; and (3) assess whether the combination of (1) and (2), along with nonspeculative inferences, was legally sufficient to permit the trial court to determine that [the trial court's conclusion regarding the existence of a current risk of harm] was satisfied."

We perceive no reason why a trial court's determination regarding whether a party was active or passive, or its negligence was primary or secondary, or, ultimately, that one party is entitled to indemnification, differs significantly from a determination whether a parent's condition presents a current risk of harm. Both are inferences drawn from historical facts. In any event, in the present case, we conclude that the trial court's determinations regarding active, primary negligence versus passive, secondary negligence, as well as its determination that the county is not entitled to indemnification, are supported not only by any evidence, but by a preponderance of the evidence.

a subsequent inspection, a different inspector approved the slope without the aforementioned engineer's approval and based on a "judgment call" that it was satisfactory. That inspector had no training in the soil or geotechnical aspects necessary to make that judgment. The evidence of the county's independent and positive actions in issuing the permit and approval were a sufficient basis for the trial court to conclude that indemnity was not justified.

While the county argues that this case is controlled by *Astoria,* we find that the older case is distinguishable in several important respects. First, the pedestrian in that case injured herself on a public sidewalk, where the city had a general duty to provide for safe conditions. By contrast, in this case, the injury occurred on private property and the county was held responsible for negligently performing its duty in providing permits to individual landowners. Additionally, in *Astoria,* the city was negligent in failing to remedy the dangerous condition on its street, but there is no indication that the city was aware of the offending condition until after the pedestrian was injured. Here, the parties stipulated that the county was aware of the excavation before issuing its approval, that it had inspected the site twice and noted some minor erosion and inadequate topsoil compaction, and that it took a distinct affirmative action—issuing a permit—after it had inspected the site. Thus, the county's awareness of the offending condition and actions prior to the alleged incident, in addition to the difference in the respective duties owed, sufficiently distinguish this case from *Astoria.* In sum, we conclude that the trial court did not err.

Affirmed.